# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs May 21, 2014

## STATE OF TENNESSEE v. VANESSA COLEMAN

**Appeal from the Criminal Court for Knox County**
**No. 86216D     Jon Kerry Blackwood, Judge**

---

**No. E2013-01208-CCA-R3-CD - Filed December 9, 2014**

---

In this case both victims were sexually assaulted. Accordingly, we will identify them by their initials. Defendant, Vanessa Coleman, was one of four defendants charged by presentment for offenses which occurred in January 2007, involving the deaths of the victims, C.N. and C.C. In her first trial, Defendant was acquitted of all charges alleging the murder, kidnapping, and rape of victim C.N. She was convicted of several counts of the lesser-included offense of facilitation of charges alleging the murder, kidnapping, and rape of victim C.C. Defendant was granted a new trial by the trial court based upon structural error in the proceedings of the first trial. Following the second trial, a jury found Defendant guilty of the following offenses against victim C.C.: three counts of facilitation of first degree murder, one count of facilitation of second degree murder, two counts of facilitation of aggravated kidnapping, six counts of facilitation of rape, and one count of facilitation of misdemeanor theft. Following a sentencing hearing, the trial court merged Defendant's convictions for facilitation of first degree murder and second degree murder into one conviction and imposed a sentence of 25 years for that conviction. The trial court also merged Defendant's two convictions for facilitation of aggravated kidnapping and imposed a sentence of six years to be served consecutively to Defendant's 25-year sentence. The trial court merged Defendant's six convictions for facilitation of rape into three convictions and imposed a sentence of four years for each conviction, to be served concurrently with each other but consecutively to Defendant's remaining sentences. For Defendant's facilitation of misdemeanor theft conviction, the trial court imposed a sentence of six months to be served concurrently with the remaining sentences. Thus, Defendant received a total effective sentence of 35 years for her convictions. In this appeal as of right, Defendant raises the following issues for our review: 1) whether the evidence at trial was sufficient to sustain her convictions; 2) whether the trial court should have dismissed the presentment because Defendant was subpoenaed to testify before a federal grand jury before the filing of the presentment in this case; 3) whether the trial court erred by admitting testimony of Defendant's statements made during unrecorded interviews; 4) whether the trial court should

have excluded photographs of the victims' bodies; 5) whether all of Defendant's convictions for facilitation of rape should have been merged into one conviction; and 6) whether the trial court erred by imposing consecutive sentences. After a thorough review of the record before us, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which ROGER A. PAGE, J. joined. D. KELLY THOMAS, JR., J., wrote a separate concurring opinion.

Theodore H. Lavit; Joseph R. Stewart; Cameron Griffith, Lebanon, Kentucky; and Russell T. Greene, Nashville, Tennessee, for the appellant, Vanessa Coleman.

Herbert H. Slatery, III, Attorney General and Reporter; John H. Bledsoe, Senior Counsel; Randall Eugene Nichols, District Attorney General; Leland Price and Ta Kisha Fitzgerald, Assistant District Attorneys General, for the appellee, the State of Tennessee.

**OPINION**

*Trial*

In portions of this opinion we refer to persons only by their last names. We mean no disrespect in doing so. As noted above, Defendant was ultimately convicted of offenses involving the death, kidnapping, and rape of C.C. and acquitted of all offenses alleging the death, kidnapping, and rape of C.N. On Saturday, January 6, 2007, both C.C. and C.N. left C.C.'s friend's apartment in C.C.'s silver Toyota 4Runner sometime after 9:00 p.m., C.C.'s mother testified that C.C. called at 12:35 a.m. on Sunday and told her father that she had decided to return to her parent's house instead of staying at her friend's apartment that night. C.C. told her parents that she was going to finish watching a movie with C.N. and then go home around 3:00 a.m. C.C.'s mother testified that she tried to call her daughter when she did not return home, but she was unable to contact her. C.C.'s father and brother called the police after they located C.C.'s 4Runner near Cherry Street on Sunday afternoon.

At approximately 12:30 a.m. on Sunday, January 7, 2007, Xavier Jenkins, a driver for Waste Connections, was on Chipman Street in Knoxville waiting for his co-workers to arrive when he saw a house that "seemed a little busy." He testified that the lights were on in the house, and he saw a silver 4Runner parked outside with its lights on. He then saw the 4Runner drive by with four black males inside. The driver gave him a "mean mug" look as he drove past him, which made Jenkins nervous. Jenkins testified that he could not see the four men's faces, but he saw their silhouettes. When Jenkins returned from his work route

between 6:30 and 7:00 a.m., he observed the 4Runner in the parking lot for Waste Connections, facing toward some railroad tracks.

Jerome Arnold lived at 2124 Chipman Street in January 2007. He testified that he was watching television at 1:45 a.m. on January 7 when he heard "three distinct pops a short distance away." Arnold testified "[t]here [were] three fairly evenly spaced pops, and that was it." The sound came from the northeast, and it "wasn't terribly far away." His house was 200 feet from a train track. At 7:45 a.m., Roy Thurman, a sandblaster, arrived for work and saw "some smoke come up back there," around a set of train tracks near his job site. J.D. Ford, a locomotive engineer for Norfolk Southern Railway, testified that he arrived at work around 8:00 a.m. on January 7, 2007. Ford testified that he saw something burning beside the tracks near Cherry Street. He testified that it appeared to be "the silhouette of a body." As the train got closer, Ford could tell that it was a body, and the legs were not burned. Ford called his dispatcher. The body was subsequently identified as victim C.N.

Lieutenant Keith Debow from the Knoxville Police Department testified that on Tuesday, January 9, 2007, he assisted in the execution of a search warrant of the residence at 2316 Chipman Street. Inside the kitchen there was a trash can that was "oddly shaped." He believed that a person might be inside the trash can. Lieutenant Debow and another officer removed the lid from the trash can and found the body of victim C.C. inside. C.C.'s body was transported by ambulance to the forensic center while still inside the trash can. Chief Medical Examiner Darinka Mileusnic-Polchan was present at the Chipman Street address when C.C.'s body was transported.

Dr. Mileusnic-Polchan conducted autopsies of both victims in this case. She testified that both victims were bound with strips of fabric from some floral bedding. Linda Littlejohn, of the Tennessee Bureau of Investigation (TBI) Crime Lab, testified that the fabric removed from both victims' bodies was consistent in color and pattern. C.C. was tied up in a fetal position, which is the position in which she died. Her body had been placed inside five layers of trash bags inside the trash can. Her face was covered with a white trash bag. Dr. Mileusnic-Polchan concluded that C.C.'s cause of death was positional and mechanical asphyxiation, meaning that her breathing had been obstructed by both the position of her body and the plastic trash bag. She testified that there was no indication that C.C. suffered strangulation (including petechia or injuries to C.C.'s neck). There was also no evidence of defensive injuries. The manner of C.C.'s death was homicide.

Dr. Mileusnic-Polchan observed "tremendous trauma" to C.C.'s anogenital area, including bruising around her anus and vagina. The most significant injury was to the area around the vaginal opening, where there was deep bruising hematoma formation and blood collecting deep in the tissue. Dr. Mileusnic-Polchan determined that the injury occurred

between one and two hours prior to C.C.'s death. She testified that there could have been other injuries, but "the big trauma on top of possibly old trauma was so overwhelming" that it was difficult to determine. There was also injury to C.C.'s cervix, and she had bruising and carpet burns on her lower back and upper buttocks. Dr. Mileusnic-Polchan testified that there was evidence of injuries to C.C.'s head that could have caused unconsciousness, but she could not conclude whether C.C. actually suffered unconsciousness. She testified that the injury to the head was not sufficient to disable the victim long-term or cause the victim's death. Seventeen photographs taken of C.C.'s body, showing her injuries, were admitted at trial. Latent fingerprints were collected from the garbage bags in which C.C.'s body was found, and the prints matched the right palm of co-defendant Lemaricus Davidson.

Daphne Sutton began dating co-defendant Lemaricus Davidson in October, 2006. Around the end of October or early November, they moved in together in the residence at 2316 Chipman Street. Sutton testified that Davidson's brother, Letalvis Cobbins (another co-defendant), and others including George Thomas (another co-defendant), Defendant, and Stacy Lawson traveled from Kentucky to Knoxville to visit several times in late 2006, and they stayed at the Chipman Street residence. Sutton testified that she and Davidson slept in the front bedroom. Cobbins and Defendant slept in the back bedroom, which was connected to the front bedroom by a bathroom. George Thomas slept in the living room. There were blankets hanging in the doorways between the bedrooms and living room.

On Friday, January 5, 2007, Sutton left the residence after she and Davidson got into an argument and Davidson slammed her against a wall. She walked to a gas station on Cherry Street and called Cassie Suttles to pick her up. On Sunday, January 7, Sutton returned to the Chipman Street residence because Davidson called her and told her to come over and get some new clothes he had for her. She testified that she tried to go through the front bedroom to the bathroom to get some of her belongings, but Davidson grabbed her and prevented her from going through the bedroom. She testified that Cobbins was sitting in a chair with his head down in the living room beside the kitchen door, and George Thomas was sitting in another chair rolling a marijuana cigarette. Sutton observed a kitchen chair in the front bedroom beside the bathroom door, which was unusual. The bathroom door was closed, and Sutton did not see Defendant. She could hear someone inside the bathroom. Davidson gave Sutton a bag of clothes. When she returned to Suttles' apartment, Sutton looked through the clothes and realized that they were not new, and she called Davidson. Davidson later drove to Suttles' apartment in an SUV, and took back some of the clothes. The following day, January 8, 2007, Davidson returned to Suttles' apartment and stayed there overnight. On Tuesday, January 9, 2007, Sutton learned that a body had been found inside the Chipman Street residence. She drove Davidson to a park and dropped him off. Davidson had a handgun in his jacket pocket.

-4-

Jody Long testified that in January 2007, Vince Wernimont asked her "to give some friends a ride that were in fear of [sic] their life." Wernimont gave Long morphine pills and asked her to drive Defendant, Cobbins, and Thomas to Kentucky. Defendant rode in the front passenger seat and she was "very quiet." Long dropped them off at Defendant's grandmother's house.

Stacy Lawson testified that in January 2007, she lived in Lebanon, Kentucky. She was friends with Defendant, whom she met through Cobbins. Lawson was dating Thomas. Lawson traveled to Knoxville with Defendant, Cobbins, and Thomas on December 28, 2006. She testified that on January 1, 2007, she had an altercation with Davidson. She testified that "there was a lot of tension in the house." Davidson threatened her with a rifle. Lawson decided to leave Knoxville. She asked Defendant if she wanted to return to Kentucky with her, and Defendant stated that she wanted to stay with Cobbins. Lawson left the following day.

Lawson saw Defendant, Cobbins, and Thomas again at Natosha Hays's house after the three returned to Kentucky. Lawson testified that they "looked scared." Later, when Lawson was alone with Defendant, she asked Defendant how she got back to Kentucky, and Defendant responded, "I don't know what you're talking about, I came back with you." Lawson testified that Defendant "wasn't her normal self" and that "everybody was kind of on edge and nervous."

Natosha Hays testified that Defendant called her in January 2007, and told her that she, Cobbins, and Thomas were returning to Kentucky from Tennessee. Sometime later, the three arrived unannounced. Hays was asleep on her couch when she heard someone banging on the windows and door. Hays testified that Defendant "didn't appear any different than any other time." The following day, the three were arrested at Hays's house.

Detective Nevil Norman, of the Knox County Sheriff's Department, testified that on Thursday, January 11, 2007, he assisted in the arrest of Defendant, Cobbins, and Thomas in Lebanon, Kentucky. Detective Norman interviewed Defendant at 1:00 p.m. that afternoon at the Lebanon Police Department. The statement was audio recorded, but the quality was bad. During the interview, Defendant "was just normal, nothing unusual about her." The audio recording and a transcript of the interview were admitted at trial. Defendant stated that she and Cobbins had not been to Knoxville since returning to Kentucky on January 2, 2007. Defendant was confronted with officers' knowledge that her statement was untrue, and Defendant denied any involvement in the offenses.

Special Agent Bernard Waggoner, of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), testified that he assisted in the arrest of Defendant, Cobbins, and Thomas

on January 11, 2007, in Lebanon, Kentucky. Agent Waggoner also assisted in a search of Natosha Hays' residence, where the defendants were arrested.

Agent Waggoner interviewed Defendant on January 17, 2007, when she appeared before a federal grand jury in Knoxville pursuant to a subpoena. Defendant's mother was present for the interview in the U.S. Attorney's Office prior to the grand jury testimony. The interview began just after 9:00 a.m. Agent Waggoner testified that the interview was not recorded, but that he took notes. He testified as follows about Defendant's statement:

> She goes further on and says that on Saturday night, Lemaricus, George Thomas and Letalvis Cobbins left together. And she doesn't know why. And she references E. And E has been identified as Eric Boyd. And [Defendant] knows Eric Boyd.

> And when Lemaricus Davidson and George Thomas and Letalvis Cobbins come back, Lemaricus Davidson had a white female blindfolded, and walked her into the house and took her into the front bedroom.

> And then she said that George Thomas and Rome [Letalvis Cobbins] had walked in first to the house, and then the girl was taken into the bedroom. And she heard the girl say, stop, don't, quit. And then [Defendant] told me that she went to sleep. [Defendant] went to sleep.

> She got up the next morning and cooked breakfast for Davidson, Thomas and Cobbins on Sunday morning. And she said that she never saw the girl again after she was brought in.

> And on Sunday, [Defendant], Cobbins, Thomas and Davidson, rode around in a Toyota 4Runner. And then she tells me that Stacy Lawson came down on Tuesday a.m. to Knoxville, in the green Grand Am and took [Defendant], Thomas and Cobbins back to Natosha Hays's house in Kentucky.

Agent Waggoner testified that Defendant told him that Davidson, Cobbins, and Thomas "never talked about the crimes in front of her," and that Davidson gave Defendant "some clothes, a red purse, a red billfold and some Britney Spears perfume." These were items that had belonged to C.C. Defendant told Agent Waggoner that she saw Davidson tying C.C. up on the bed in the front bedroom. She stated that on Monday, January 8, 2007, she walked with Cobbins and Thomas to Vince Wernimont's house, and that Thomas told

her to lie about when they returned to Kentucky, telling Defendant to say that they returned to Kentucky on January 2, 2007.

Agent Waggoner testified that he stepped outside the office and spoke to Defendant's mother. Defendant's mother then spoke privately to Defendant and then told Agent Waggoner that Defendant wished to speak to him again. When the interview resumed, Defendant told Agent Waggoner that she saw Davidson kill C.C. "by snapping her neck." Defendant then began to cry.

Agent Waggoner then spoke to his supervisor, the U.S. Attorney, and the Knox County homicide detective, and they began a second interview of Defendant at 11:40 a.m. Agent Waggoner testified that he took notes during the second interview while the U.S. Attorney and investigators questioned Defendant. During the second interview, Defendant stated that Davidson, Cobbins, and Thomas left the Chipman Street residence at 1:00 a.m. on Sunday, January 7, 2007. Davidson was armed with a revolver. Thomas and Cobbins returned alone, and Davidson brought "the white female, [C.C.], into the house barefooted and blindfolded with a blue bandana." Davidson took C.C. into his bedroom. Agent Waggoner testified,

> And [Defendant] now says that she saw Davidson tie her up with a wide strip of cloth in a chair. And then he – she saw the female victim laid down – was laid down by Davidson on an air mattress, and her hands were tied above her head. At this point, the – she tells me that the female victim still had her clothes on.

> And Davidson comes into the living room with Cobbins and Thomas. And [Defendant] says that she asked about the girl and they refused to tell her anything about it, and told her – told [Defendant] to go into the back bedroom.

> She said she also, at some point, saw Davidson pull some stickers off of the Toyota 4Runner. And this – at this point, she tells me that they would not let her – [Defendant] leave the house.

Defendant stated that Davidson, Cobbins, and Thomas went into the front porch area of the house and talked. Davidson then went to his bedroom, and Defendant heard C.C. say, "don't, stop, quit." Cobbins and Thomas were in the living room. She then stated that Davidson and Thomas left in the 4Runner, and Cobbins stayed at the house with her. Defendant stated that Davidson took a large floral comforter with him, and Defendant never saw the comforter again. Defendant went into the bedroom and saw C.C. "still tied up and

blindfolded." Davidson and Thomas returned to the residence about 30 minutes later. Thomas told Defendant that C.C. "was being quiet because if she went along with what they were doing to her, she would be set free." Davidson and Thomas put the clothes they were wearing into the washing machine. Defendant stated that Davidson and Thomas "were both acting nervous." She asked them what was going on, and they refused to tell her. Defendant heard Davidson tell Thomas, "well, that's taken care of." Defendant stated that Eric Boyd then came to the residence and talked to Davidson, Thomas, and Cobbins for 10 to 15 minutes. Defendant saw the 4Runner parked down the street at the waste station.

Defendant saw Davidson lying beside C.C. on his bed. Davidson was using a cell phone, and Defendant heard Davidson ask C.C. for a password. Defendant stated that she slept with Cobbins in the back bedroom, and Thomas slept in the living room. The following morning, Thomas told Defendant that Davidson "had slept with [C.C.], meaning that he'd had sex with her." When Defendant saw Davidson, he was only wearing shorts. Defendant stated that Davidson left in the 4Runner several times during the day on Sunday. Cobbins and Thomas checked in on C.C. throughout the day. At some point, Defendant took a drink of water to C.C. C.C. was still tied up, "but they – somebody let her smoke cigarettes." Defendant stated that at some point on Sunday, all four of them left in the 4Runner, leaving C.C. "alive in the house alone and tied up."

On Sunday night, Davidson washed his bed sheets. Defendant saw Davidson tear up a floral patterned sheet that matched the comforter she saw him take from the house the prior day. Defendant saw Davidson walk C.C., who was not wearing any clothes from the waist down, to a closet in the back bedroom when Daphne Sutton came to the house on Sunday. Defendant was in the living room when she saw Davidson with C.C. in the back bedroom, and she saw Davidson choke her and "snap[ ] her neck." C.C. fell to the ground. Thomas was in the back bedroom with Davidson and C.C. Davidson then took C.C. into the living room, sprayed "something that smelled like bleach" in her mouth, and tied her body up into a fetal position. Davidson then covered her in garbage bags. Defendant told Davidson that she was going to call the police, and Davidson threatened to kill her if she called the police. Defendant stated that she did not see it but was told that Davidson put C.C.'s body inside the garbage can. Davidson left in the 4Runner and returned in about two minutes. He sat around the house, and then said that he had "to take the trash out." Defendant fell asleep at around 5:00 a.m. on Monday and woke up around 11:00 a.m. When she awoke, Davidson was not at the house, and the trash can was still in the kitchen. Defendant, Cobbins, and Thomas left the house and walked to Vince Wernimont's house. Thomas and Cobbins later went back to the Chipman Street residence to get Defendant's clothes, and Thomas, Cobbins, and Defendant stayed at Wernimont's house for several hours before going to Wernimont's girlfriend's house. The following day, Jody Long drove the three to Kentucky.

Agent Waggoner did not participate in Defendant's testimony before the federal grand jury, but he was present the following day when Defendant was interviewed again at the Knox County District Attorney's Office. Defendant's father was present for the interview. That interview was not recorded, and Agent Waggoner did not take notes. He testified that Defendant's statements were consistent with her statements the previous day.

Agent Waggoner testified that Defendant was voluntarily placed into protective custody in Knoxville on January 26, 2007, after her name was reported by the news media. On January 28, 2007, Defendant and her mother left protective custody and returned to Kentucky. Defendant's father drove to Knoxville to pick up Defendant and her mother at the ATF Office. While they were at the ATF Office, agents interviewed Defendant again. Defendant told agents "the same things that she had told us before." Agent Waggoner stopped the interview and told Defendant's mother to urge Defendant to "tell us the truth about this." After Defendant's father arrived, Agent Waggoner resumed the interview, and Defendant stated that she had touched the cloth bindings that were used to tie up C.C. At that point, Agent Waggoner began recording the interview and went back over everything that they had already talked about. The recording of the interview and transcript were admitted at trial. Agent Waggoner saw Defendant again on January 31, 2007, when he went with two detectives from the Knoxville Police Department to Lebanon, Kentucky to arrest Defendant after the presentment was returned by the Knox County Grand Jury. Agent Waggoner testified that he was present during the detectives' interview of Defendant prior to her arrest, and to his knowledge, Defendant was not informed of the presentment until after the interview concluded.

Detective Todd Childress, of the Knoxville Police Department, participated in the interview of Defendant on January 18, 2007. Detective Childress testified that Defendant stated that she was "scared and held hostage" during the commission of the offenses. Detective Childress also participated in the interview of Defendant on January 31, 2007. Defendant's statement was recorded and admitted into evidence along with a transcript. Defendant stated that on Sunday, January 7, 2007, Davidson, Cobbins, Thomas, and Defendant left C.C. tied up and alone in the Chipman Street house while they left in the 4Runner.

TBI Agent Jennifer Millsaps analyzed the vagina, anal, and oral swabs taken from C.C. Agent Millsaps found the presence of spermatozoa in both the vaginal and anal swabs, and both contained a mixture of DNA of C.C. and Davidson. The oral swab contained semen, and the DNA was a mixture of C.C. and Cobbins. Agent Millsaps also analyzed two stains on C.C.'s tank top, and both tested positive for the presence of spermatozoa, and both contained DNA of Cobbins.

Agent Millsaps also examined the floral fabric collected during the autopsy of C.C., and determined that it had several stains containing spermatozoa. One stain contained DNA of Defendant and Cobbins. Another stain contained DNA from an unidentifiable female and Cobbins. A third stain contained spermatozoa and the DNA of Defendant and Cobbins. A fourth stain also contained spermatozoa and the DNA of C.C., Defendant, and Cobbins. Agent Millsaps examined C.C.'s jeans, which contained the DNA of Cobbins and Davidson. She also examined cuttings from an inflatable bed recovered from the residence. The first contained blood and spermatozoa and the DNA of Davidson and Sutton. Another contained blood matching Sutton's DNA. A third cutting contained spermatozoa and DNA of C.C. and an unidentifiable person. Agent Millsaps also tested a white cloth strip from a gray purse. One section had a mixture of DNA of Defendant and C.C. Another section had DNA of C.C. and other unidentifiable persons. Two other sections contained DNA of the C.C., Davidson, and Sutton.

Dr. Larry Miller, a forensic document examiner, testified that he compared handwriting by Defendant to handwriting in a journal recovered following Defendant's arrest, and he concluded that the handwriting matched. From an entry dated January 8-9, 2007, Defendant wrote:

Think!

Wake up! And look around! What[']s [r]eally goin[g] on! I don[']t have [a] clue or at least I use[d] to be able to say I don[']t know, but as much as I've seen and observed and learned, I know exactly what[']s goin[g] on. Although a lot of this is new to me. Life is a trip, but it[']s amazing how things play its own role. Life is interesting [and] full of surprises even very unexpected things happen that you don[']t expect.

Nessa!

An entry for January 9, 2007, states:

Crazy!

Last night was one of a kind. We stayed w/a crackhead that is cool as hell. It snowed a lil bit but it's already melted. Let's talk about adventures! I had one HELL OF AN ADVENTURE since I've been in the big T.N. [I]t's a crazy world these days! But I love the fun adventures [and] lessons that I've learned. It[']s going to be a long interesting year!

-10-

Ha! Ha!

Nessa!

The entry continued onto the following page as follows:

The ride home! Ha. Ha. We had a crackhead bringin[g] us back. The whole way back she was complaining b/c she didn't have any drugs. She was drivin[g] kinda crazy, but it was str8 tho.

On the last page, the entry reads:

THE END!

How interesting is your life?

I bet it won't compare to mine!

Cuz I love my life!

## *Analysis*

### *Sufficiency of the evidence*

Defendant contends that the evidence was insufficient to sustain her convictions. Specifically, Defendant asserts that the evidence at trial was entirely circumstantial, and Defendant challenges the sufficiency of the evidence that she facilitated in the commission of the specific crimes. After all the mergers of convictions, Defendant stands convicted of one count of facilitation of first degree murder of C.C., one count of facilitation of aggravated kidnapping of C.C., three counts of facilitation of rape of C.C., and one count of facilitation of misdemeanor theft.

When a defendant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *see also* Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence,

as well as all factual issues raised by the evidence, are resolved by the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. *Id*. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 203 Tenn. 440, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

"A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." T.C.A. § 39-11-403(a). Defendant does not challenge the sufficiency of the evidence to prove that her co-defendants committed first degree murder, aggravated kidnapping, rape, and misdemeanor theft. Therefore, we will confine our discussion to the proof regarding Defendant's facilitation.

Both direct and circumstantial evidence presented at the trial, viewed in the light most favorable to the State and together with all reasonable inferences drawn therefrom, supports a conclusion that Defendant knew that one or more of her co-defendants intended to commit first degree murder, aggravated kidnapping, rape, and misdemeanor theft, *and* that Defendant furnished substantial assistance in the commission of the felonies. Such evidence includes:

(1)     Defendant admitted that while she was staying at Davidson's residence, Defendant saw co-defendants Davidson, Cobbins, and Thomas leave on Saturday night. When they returned, Davidson brought in a blindfolded white female and took her into the front bedroom. She soon heard the blindfolded victim saying, "stop, don't, quit." From this the jury could infer Defendant knew an aggravated kidnapping was in progress and that rape was about to begin.

(2)     Defendant admitted in one statement that she observed Davidson tie up the victim on the bed in the front bedroom.

(3)     The multiple wounds inflicted upon C.C. as depicted in the autopsy photographs admitted into evidence are proof that the rapes took a considerable period of time and were vicious and violent, and the jury could reasonably infer that the rapes caused a substantial amount of noise. From this, the jury could reasonably conclude that Defendant could not have been unaware of her co-defendants' criminal intent to commit aggravated kidnapping and rape.

(4)     Defendant stated in one of her interviews with police that she saw Davidson kill the victim by snapping the victim's neck. This alleged cause of death is inconsistent with the cause of death found by the medical examiner during the autopsy. A jury is entitled to reject some portions and accept other portions of a defendant's statement. *State v. Gilbert*, 612 S.W.2d 188, 190 (Tenn.Crim. App. 1980) (citing *Batey v. State*, 527 S.W.2d 148 (Tenn. Crim. App. 1975)). Thus, the jury could find that Defendant observed the method used by co-defendant Davidson to kill the victim. The jury could find credible the medical examiner's testimony that the victim was alive when she was tied in the fetal position inside garbage bags with a plastic garbage bag around her head and stuffed into a trash can, where she later died from asphyxiation. This shows Defendant knew, prior to the victim's death, that Davidson intended to kill the victim.

(5)     Evidence was introduced that a sheet or sheets were torn in order to make the cloth bindings which were used to tie up the victim. In one of her statements, Defendant admitted that she had touched these bindings. From this the jury could reasonably infer that Defendant had tied up or helped to tie up the victim and/or make the bindings out of the sheet(s).

(6)     In her statements to police Defendant admitted that at least two times prior to the victim's death, Defendant "checked" on the victim who was tied up in the front bedroom. From this evidence the jury could reasonably infer that Defendant assisted the co-defendants by helping to guard the victim during the time period in which the murder, aggravated kidnapping, and rapes occurred.

(7)     Defendant admitted in one of her statements that at some point on Sunday, she, Davidson, Cobbins, and Thomas left the house to ride around in the victim's 4Runner, and they had left the victim "alive in the house alone and tied up." Even though Defendant asserted in one statement that she herself was being held as a hostage by her co-defendants, the jury could find that assertion not credible, and could infer from

-13-

Defendant's admission about riding around with the co-defendants after they left the victim "alone and tied up" that she was in full cooperation with the co-defendants in the commission of the various crimes.

(8)     Defendant admitted in one of her statements to police that she saw Davidson "walk" the victim through the house while the victim was not wearing any clothes below her waist. As the jury does not have to find Defendant's timeline of events credible, and can still find as true parts of Defendant's statement, the jury could reasonably infer that Defendant knew Davidson intended to rape the victim.

(9)     Defendant admitted that she obtained possession of the victim's purse, billfold, perfume, and clothes. The jury could infer that Defendant received these items from Davidson at a time that Defendant was providing substantial assistance to the principal perpetrators during the commission of the crimes.

(10)    Defendant left Knoxville with two co-defendants shortly after the crimes were committed and went to Kentucky, where she attempted to establish a false alibi by telling her friend Stacy Lawson on January 9, 2007, "I came back [to Kentucky] with you [Lawson]" on January 2, five days prior to the crimes in Knoxville. The jury can accept as evidence of Defendant's guilt her flight from the crime scene and the attempt to establish a false alibi. *See Sotka v. State*, 503 S.W.2d 212, 221 (Tenn. Crim. App. 1972) (An accused's flight does not, alone, establish guilt, "but taken in connection with other facts may become one of a series of circumstances from which guilt may be inferred."); *see also State v. Bruce D. Mendenhall*, No. M 2010-01381-CCA-R3-CD, 2013 WL 360525, at *59 (Tenn. Crim. App., Jan. 30, 2013), *perm. app. denied* (Tenn., June 11, 2013) (held that evidence of the defendant's attempts to obtain a false alibi were probative to establish motive, intent, and absence of mistake in Rule 404(b) analysis).

(11)    The two journal entries written by Defendant on January 8 and 9, 2007 (the two days following the victim's death) state in part, "Life is interesting [and] full of surprises even very unexpected things happen that you don[']t expect . . . Crazy! . . . Let's talk about adventures! I had one HELL OF AN ADVENTURE [sic] since I've been in the big T.N. [sic] [I]t's a crazy world these days! But I love the fun adventures [and] lessons that I've learned." From these writings the jury could reasonably infer the Defendant knowingly furnished substantial assistance to her co-defendants in the commission of murder, aggravated kidnapping, rapes, and misdemeanor theft. The jury could infer that Defendant facilitated the commission of the crimes with fervor and excitement.

Defendant relies upon this Court's unpublished opinion in *State v. Ruby Breeden*, No. E2004-01512-CCA-R3-CD, 2005 WL 3199280 (Tenn. Crim. App. Nov. 30, 2005) to support her assertion that she is entitled to relief on the evidentiary sufficiency issue. In *Ruby Breeden*, a panel of this court reversed and dismissed the facilitation of first degree murder conviction of one of the defendants on the basis that the evidence totally failed to establish that the defendant knew the co-defendant intended to kill the victim. *Id*. at \*5. The court in *Ruby Breeden* also relied upon prior law controlling the review of cases based entirely upon circumstantial evidence. *Id*. at \*4. Since *Ruby Breeden* was filed, the Tennessee Supreme Court has clarified that in Tennessee whenever a conviction is based upon circumstantial evidence, "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *U.S. v. Bell*, 678 F.2d 547, 549 (5th Cir. 1982) (as quoted with approval in *Dorantes*, 331 S.W.3d at 381. Furthermore, as detailed above, in Defendant's case there is evidence that Defendant knew her co-defendants intended to commit the crimes for which she was convicted of facilitation. Defendant's reliance on *Ruby Breeden* is therefore misplaced. Most of the remainder of Defendant's sufficiency argument relies upon cases which hold that mere presence at a crime scene is not sufficient to establish guilt of facilitation of a crime. *See State v. Breeden*, at \*4-5; *State v. Caldwell*, No. E2008-00307-CCA-R3-CD, 2009 WL 2191706 (Tenn. Crim. App. Oct. 6, 2009). As we have set forth above, there is sufficient circumstantial evidence that Defendant was *not* "merely present."

After a thorough review of the record and Defendant's argument, we conclude that Defendant is not entitled to relief on this issue, and that there is sufficient evidence to support the jury's determination that Defendant was guilty beyond a reasonable doubt.

*Federal grand jury subpoena*

Defendant contends that the trial court erred by denying her motion to dismiss the presentment because she was subpoenaed to testify before a federal grand jury before the filing of her presentment. Before her first trial, Defendant moved to dismiss the presentment under Rule 6(j)(6) of the Tennessee Rules of Criminal Procedure, arguing that her subpoena to testify before the federal grand jury barred her state court prosecution. The presiding trial judge denied the motion but granted an interlocutory appeal under Rule 9 of the Tennessee Rules of Appellate Procedure. This court denied an interlocutory appeal, concluding that Defendant's probability of success on appeal was not so great as to justify an immediate appeal. The Tennessee Supreme Court denied an interlocutory appeal, and the case proceeded to trial. Defendant renewed her motion to dismiss prior to her second trial, and the trial court denied the motion, relying on this court's order denying interlocutory appeal.

-15-

Defendant asserts that this issue should be reviewed under a de novo standard because questions of law are reviewed de novo. *See Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001). The State asserts that the issue should be reviewed for an abuse of discretion because that is the standard under which we review a trial court's decision to dismiss a presentment. *See State v. Merriman*, 410 S.W.3d 779, 791 (Tenn. 2013). Under either standard of review, our conclusion is the same. Because Tennessee Rule of Criminal Procedure 6(j)(6) does not apply to federal grand jury proceedings, the rule does not provide immunity to Defendant.

Tennessee Rule of Criminal Procedure 6(j)(6) provides that "[n]o witness shall be indicted for any offense in relation to which the district attorney general has compelled the witness to testify before the grand jury." Tennessee Rule of Criminal Procedure 6 applies only to proceedings in state grand juries within the State of Tennessee. It does not apply to proceedings in any federal grand jury within the State of Tennessee or elsewhere. Accordingly, the provisions of the rule can only apply to compelled testimony before a state grand jury within the State of Tennessee. Defendant was subpoenaed to testify before a federal grand jury of the United States of America. Accordingly, Defendant is not entitled to relief on this issue.

*Admissibility of Defendant's unrecorded statements*

Defendant contends that the trial court erred by allowing into evidence Agent Waggoner's testimony about statements made by Defendant during an unrecorded interview. The State asserts that Defendant's statements to Agent Waggoner were admissible as party-opponent admissions under Tennessee Rule of Evidence 803(1.2). *See State v. Lewis*, 235 S.W.3d 136, 145 (Tenn. 2007) (defendant's statement may be admissible as an admission by a party-opponent). Defendant cites *State v. Cartwright*, No. W2010-01253-CCA-R3-CD, 2011 WL 2410370 (Tenn. Crim. App., June 10, 2011), *perm. app. denied* (Tenn., Oct. 18, 2011), and argues against the admissibility of the statement because "there was no evidence that the defendant adopted the statement or indicated a belief in its truth." The State responds that this case is distinguishable from *Cartwright* because the State did not seek to admit Agent Waggoner's notes from the interview as if they were Defendant's statement, but rather Agent Waggoner testified about the statements Defendant made while he refreshed his recollection by reviewing his notes taken during the interview.

We agree with the State's position that Agent Waggoner's testimony about statements Defendant made during the unrecorded interview are admissible as party opponent admissions under Rule 803(1.2)(A), which provides that "[a] statement offered against a party that is . . . the party's own statement in either an individual or a representative capacity" is "not excluded by the hearsay rule." Tenn. R. Evid. 803(1.2) (2006). In *Cartwright*, the investigating agent paraphrased the statement of the defendant in writing, and the defendant

initialed each paragraph and signed the written statement. The defendant challenged the admissibility of the statement at trial, arguing that the statement was not his own statement, but rather a paraphrased account of his interview by the investigating agent. A panel of this court concluded that in order to be admissible as an admission by a party-opponent, Cartwright must have adopted the statement or indicated a belief in its truth under Tenn. R. Evid. 803(1.2)(B). We held that the statement was properly admitted because the defendant did, in fact, acknowledge the statement by initialing each paragraph and signing each page. The defendant also added his expression of remorse at the conclusion of the document in his own handwriting and signed the document.

Unlike the defendant's statement in *Cartwright*, in this case, Agent Waggoner testified from his memory of Defendant's interview. It was not necessary for Defendant to adopt the statement of Agent Waggoner because it was not presented to the jury as Defendant's own statement, but rather Agent Waggoner's memory of statements made by Defendant. Defendant is not entitled to relief on this issue.

*Admissibility of photographs*

Defendant contends that the trial court erred by allowing into evidence graphic and gruesome photographs of the deceased victims. Defendant asserts that the photographs were prejudicial and caused the jury confusion of the issues. The State responds that Defendant has waived consideration of the issue by failing to support her argument with appropriate citations to authority. Under Tennessee Rule of Appellate Procedure 27(a)(7)(A), an appellant must provide an argument setting forth "the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on." Under Tennessee Court of Criminal Appeals Rule 10(b), "[i]ssues which are not supported by argument, citations to authorities, or appropriate references to the record will be treated as waived in this court." In fact, even "constitutional objections to the admission of evidence may be waived by the failure to cite appropriate authority." *State v. Sexton*, 368 S.W.3d 371, 411 (Tenn. 2012) (citing *State v. Boling*, 840 S.W.2d 944, 949 (Tenn. Crim. App. 1992)).

Defendant argues that the photographs of both victims "were improper, were unfairly prejudicial, and created confusion of the issues." Defendant also asserts that the photographs were "simply not relevant," apparently because Defendant was charged with facilitation rather than the underlying offenses and because Defendant had been acquitted of any offenses against C.N. in the first trial. Defendant contends that "two extremely graphic photographs of [C.N.]" were not relevant and were unfairly prejudicial and used to inflame the jury. However, Defendant does not cite any legal authority in support of her argument.

In any event, the two photographs of C.N. were relevant pertaining to a count of the presentment that the jury acquitted Defendant of in the second trial. That count charged Defendant with facilitation of felony murder of C.C. during the perpetration of a kidnapping of C.N. It can be legitimately argued that the photographs of C.N. supported the allegation that he had been kidnapped prior to his death.

We agree with the State that Defendant's brief regarding the issue of C.C.'s photographs is inadequate. Defendant does not make any identifiable argument about the admissibility of C.C.'s autopsy photographs. Nevertheless, we conclude that the trial court did not abuse its discretion by admitting the photographs.

The admissibility of photographs is governed by Tennessee Rules of Evidence 401 and 403. *See State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978). Under these rules, the trial court must determine, first, whether the photograph is relevant. Tenn. R. Evid. 401; *Banks*, 564 S.W.2d at 949. Next, the trial court must determine whether the probative value of the photograph is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403; *Banks*, 564 S.W.2d at 950-51. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id*. Photographs offered by the State must be relevant to prove some part of its case and must not be admitted solely to inflame the jury and prejudice it against the defendant. *Id*. Whether to admit the photographs rests within the sound discretion of the trial court and will not be reversed absent a clear showing of an abuse of that discretion. *Id*. at 949; *see also State v. Dickerson*, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993); *State v. Allen*, 692 S.W.2d 651, 654 (Tenn. Crim. App. 1985).

Seventeen photographs taken of C.C.'s body were admitted at trial. The photographs showed the brutality of the crime. The relevance was that Defendant was present during the repeated raping of C.C., and by Defendant's own account, she only heard C.C. say "stop, don't, quit." C.C.'s lip was torn from oral rape. Her vagina and anus were so severely injured that blood had collected deep in the tissue and a hematoma had formed. The multiplicity of the wounds and brutality of the attack were relevant to show that Defendant could not have been unaware of the offenses occurring. We conclude that the trial court did not abuse its discretion by allowing the photographs into evidence. Defendant is not entitled to relief on this issue.

*Merger of offenses*

Defendant contends that her convictions for facilitation of rape as to C.C. should have been merged, and that the trial court's failure to merge the offenses violates double jeopardy. The State responds that Defendant's convictions are proper because they were for three

-18-

separate offenses, including the facilitation of anal, oral, and vaginal rape of the victim. We agree with the State.

Whether multiple convictions violate double jeopardy is a mixed question of law and fact that this court reviews de novo without any presumption of correctness. *State v. Watkins*, 362 S.W.3d 530, 543 (Tenn. 2012) (citing *State v. Thompson*, 285 S.W.3d 840, 846 (Tenn. 2009)).

During the victim's autopsy, swabs were taken from the victim's anus, mouth, and vagina. Semen and DNA matching Cobbins was found in C.C.'s oral swab; the anal swab tested positive for spermatozoa and it contained DNA matching Davidson; and the vaginal swab tested positive for semen and spermatozoa and contained DNA matching Davidson.

In *State v. Phillips*, 924 S.W.2d 662, (Tenn. 1996), the Tennessee Supreme Court considered whether the defendant's three convictions for aggravated rape predicated upon three separate penetrations violated the Double Jeopardy Clause. Relying upon *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794, 109 S. Ct. 2201, 104 L. Ed. 2d 865 (1989), the court concluded that they did not. *Id*. at 664-65. As the court explained:

> Preliminarily, we note that "although separate acts of intercourse may be so related as to constitute one criminal offense, generally rape is not a continuous offense, but each act of intercourse constitutes a distinct and separate offense." Moreover, each of the above-described acts is separately defined in Tenn. Code Ann. § 39-13-501(7) as a discrete type of sexual penetration subsumed by Tenn. Code Ann. § 39-13-502, the aggravated rape statute. Each act, in our opinion, is capable of producing its own attendant fear, humiliation, pain, and damage to the victim. Each type of penetration requires a purposeful act on the part of the perpetrator.

*Id*. at 664 (footnotes omitted).

The evidence at trial showed that the victim was penetrated anally, orally, and vaginally by two of Defendant's co-defendants, Davidson and Cobbins. Therefore, the evidence clearly supports three separate offenses of facilitation of rape. Defendant is not entitled to relief on this issue.

*Sentencing*

Finally, Defendant challenges the trial court's finding that Defendant was a dangerous offender under T.C.A. § 40-35-115(b)(4) and argues that her sentence is excessive. In *State v. Bise*, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. Our supreme court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id*. at 554-55; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id*. at 707.

Our supreme court extended the *Bise* standard to appellate review of the manner of service of a sentence and consecutive sentencing. The court explicitly held that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). In *State v. Pollard*, the Court held, "the appropriate standard of appellate review for consecutive sentencing is abuse of discretion accompanied by a presumption of reasonableness." *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013). We also recognize that the defendant bears "the burden of showing that the sentence is improper." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2010); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of

the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103 (2014).

Consecutive sentencing is a matter addressed to the sound discretion of the trial court. *State v. James*, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984). A trial court may order multiple sentences to run consecutively if it finds, by a preponderance of the evidence, that at least one of the seven statutory factors exists. T.C.A. § 40-35-115(b)(1)-(7) (2014). In addition to these criteria, consecutive sentencing is subject to the general sentencing principle that the length of a sentence should be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed." T.C.A. § 40-35-102(1), -103(2) (2014); *see also State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002).

At the sentencing hearing, the trial court heard victim impact statements from C.C.'s mother and father. A presentence report was also admitted into evidence. At the conclusion of the sentencing hearing, the court found Defendant's age and lack of a prior criminal history to be mitigating factors. Regarding enhancement factors, the court stated as follows:

> And the Court does find that [Defendant] allowed – or treated – allowed or treated the victim in this case with exceptional cruelty. It may not have been that she did any one thing to the body or this victim, but the psychological cruelty that was inflicted on this – on this unfortunate victim was amiss and was exceptional. And there's no way that any of the defendants that were involved in this case can be separated from that psychological fear and cruelty that was inflicted upon this lady. It is so horrific, that this one factor, in and of itself, outweighs any degree – any mitigating factors that are presented on behalf of the defendant.

The court found that the exceptional cruelty of the offenses in this case "outweigh[ed] all of the mitigating factors presented in this case." The court sentenced Defendant to 25 years for her facilitation of first degree murder conviction; six years for her facilitation of aggravated kidnapping conviction, to be served consecutive to her 25-year sentence; four years for each of her three facilitation of rape convictions, to be served concurrently with each other but consecutively to her remaining sentences; and six months for her facilitation of theft conviction, to be served concurrently with the remaining sentences. Defendant's total effective sentence is 35 years.

The trial court found that consecutive sentencing was necessary because Defendant is a dangerous offender, whose behavior indicates little regard for human life and no hesitation about committing a crime in which the risk to human life is high. *See* T.C.A. § 40-

35-115(4) (2014). Our Supreme Court has noted that the "dangerous offender" category is the hardest and most subjective to apply. *State v. Lane*, 3 S.W.3d 456, 460 (Tenn. 1999). Consequently, our Supreme Court in *State v. Wilkerson* held that "particular facts" must show the following in order to base consecutive sentencing on subsection 115(b)(4): (1) that an extended sentence is necessary to protect the public against further criminal conduct by the defendant; and (2) that the consecutive sentences reasonably relate to the severity of the offenses committed. 905 S.W.2d 933, 938-39 (Tenn. 1995); *see State v. Robinson*, 146 S.W.3d 469, 524 (Tenn. 2004).

In discussing the applicability of the "dangerous offender" category to Defendant, the trial court stated:

> I don't believe that there's any more subjective finding that a Court can make in determining whether or not a person is a dangerous offender. I don't think it has to be a past history of dangerous – of criminal activity to characterize one as a dangerous offender. I think you can be as dangerous an offender being a first offender based upon the fact[s] and circumstances of a case.

> Each and every one of the defendants that were engaged in this criminal episode, no matter what manner of degree for their participation in this crime, is a dangerous offender.

> To have committed this crime under the circumstances that they – it was committed, even being there, not doing anything in the world to stop it, convinces a dangerous abil [sic] – convinces this Court the dangerousness of that person.

> You cannot convince this Court that there's not something that some – that [Defendant] couldn't have done to have brought this to – escape, shout, no, do something, to have stopped this – to have at least shown to the Court that she was there while this crime was being committed and acquiesced in it.

> The crime in itself, and anyone that's involved in it, to this Court, convinces a dangerous – a dangerous capacity which consecutive sentences are necessary to protect the public and restrain and protect society against future criminal behavior.

We conclude that the evidence supports the trial court's imposition of consecutive sentences. The facts at trial showed that Defendant was in the house for nearly two days where C.C. was confined and brutally raped before she was tied up, wrapped in five plastic trash bags, and stuffed into a garbage can, where she died from asphyxiation. In contemporaneously written journal entries, Defendant described "one HELL OF AN ADVENTURE . . . in the big T.N." and wrote that she "love[d] [her] life!" This evidence supports the trial court's finding that Defendant is a dangerous offender. Furthermore, the nature of this crime supports the trial court's finding that consecutive sentencing is necessary to protect the public and that the sentence is reasonably related to the seriousness of the offenses committed. Defendant is not entitled to relief on this issue.

## CONCLUSION

For the reasons stated herein, we affirm the judgments of the trial court.

_____

THOMAS T. WOODALL, PRESIDING JUDGE